UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X

IN RE THE EXTRADITION OF
GEORGES BARKER,                                              23-MJ-27 (SIL)

---------------------------------------------------------------X    **MEMORANDUM OF**
**DECISION AND ORDER**

**STEVEN I. LOCKE, United States Magistrate Judge:**

Presently before the Court is George Barker's ("Defendant" or "Barker") motion to be released on bail pending a determination on the extradition proceedings against him, commenced at the request of French authorities. *See* DEs [13], [16] (transcript of proceedings, Feb. 2, 2023, "Tr. I"), [17] (transcript of proceedings Feb. 10, 2023, "Tr. II"). For the reasons set forth on the record at the February 10, 2023 oral argument, and more fully below, the motion is granted.

I.   BACKGROUND

The facts underlying these proceedings submitted by the Office of the United States Attorney are as follows. Although a specific time frame was not given, at some point in the late 1990s a French investigation determined that Barker, along with co-conspirators, was involved in a drug trafficking ring bringing cocaine from French Guiana and Suriname to France using couriers. Complaint and Affidavit in Support of Arrest with a View Toward Extradition ("Compl."), DE [1], ¶ 5.a. On January 22, 1998, Frederic Touloupe ("Frederic") and Avril Dey ("Dey") were arrested by French customs agents upon arriving at Orly International Airport, arriving on a flight from Cayenne, French Guiana. *Id.* Frederic had 4.7 kilograms of cocaine in his possession.

*Id*. According to Frederic, his sister, Nelly Touloupe ("Nelly") had introduced him to a Guyanese couple, and the man in the couple, later identified as Barker, gave him the drugs, while the woman gave him a plane ticket and $6,000 USD. *Id*. ¶ 5.b. Frederic was told that someone would meet him at Orly and take him to the Hotel Terminus-Nord in Paris. *Id*. Dey told French authorities that a couple she knew as Georges and Wamba had told her to accompany a woman to Paris in exchange for $2,000 USD. *Id*. ¶ 5.c.

On that same day, French investigators also learned that two women from French Guiana had called and booked a room at the same hotel under the name "Deie." *Id*. ¶ 5.d.

On January 24, 1998, French customs agents picked up Willie Lewis West ("West") on a flight from Cayenne with 4.7 kilograms of cocaine. *Id*. ¶ 5.e. West admitted making such ten drug runs between 1996 and 1998, being paid $10,000 per trip. *Id*. Once in Paris, he would be met at the Hotel Terminus-Nord where someone would pick up the drugs. *Id*. West had a phone number for "George" in his phone and had had contact with Barker in relation to earlier trips. *Id*.

On February 16, 1998, Natalie Deie was picked up at Orly airport with 2.55 kilograms of cocaine by French customs agents where she admitted to doing a previous run and meeting a contact at the Hotel Terminus-Nord. *Id*. ¶ 5.f.

On March 9, 1998, investigators went to the home of Yvelaw Christian ("Christian"), whose number Deie had and used from the Hotel Terminus-Nord. *Id*. ¶ 5.g. Although Christian was not home, a man who identified himself as Jordan

Hashley was there. Hashley explained that he was a fisherman and a friend of Christian's, and was released. *Id*.

Christian later turned himself in and identified Hashley as Defendant Georges Barker. *Id*. ¶ 5.h; Tr. II at 26-27 (Defense counsel suggesting that this conversation may have taken place in Guyana but not disputing the underlying conversation for the purposes of oral argument). Christian also explained how the drug ring worked, with Barker and his wife recruiting couriers and that Barker had been advised of Frederic's and Dey's arrests. Compl. ¶ 5.h. Nelly then identified Barker as one of the leaders of the operation. *Id*. ¶ 5.i. Barker was then identified by a number of witnesses from a photograph. *Id*. ¶ 5.j.

In any event, on April 2, 1999, a French Magistrate issued a warrant for Barker's arrest. Compl. ¶ 3. On October 29, 1999, Barker was convicted *in absentia* in the Criminal Court in Creteil, France on drug related charges: (1) illegal importation of narcotics (cocaine) contrary to Articles 222-36 ¶ 1 and 222-41 of the French Penal Code; Articles L627, 5171-72 and 5179-81 of the Code of Public Health; and Article 1 of Ministerial Decree 90-A498 2/22/1990; (2) illegal transport of narcotics (cocaine), contrary to Articles 222-37 ¶ 1 and 222-41 of the French Penal Code; Articles L627, 5171-72 and 5179-81 of the French Code of Public Health; and Article 1 of Ministerial Decree 90-A498 2/22/1990; (3) illegal possession of narcotics (cocaine) contrary to Articles 222-37 ¶ 1 and 222-41 of the French Penal Code; Articles L627, 5171-72 and 5179-81 of the French Code of Public Health; and Article 1 of the Ministerial Decree 90-A498 2/22/1990; (4) illegal offer or sale of narcotics (cocaine),

3

contrary to Articles 222-37 ¶ 1 and 222-31 of the French Penal Code; Article L627, 5171-72 and 5179-81 of the French Code of Public Health; and Article 1 of Ministerial Decree 90-A498 2/22/1990; and (5) importation of totally prohibited goods (cocaine), contrary to Articles 414 ¶ 1, 417, ¶ 1, 418, 420-22 and 38 of the French Customs Code. *Id*. ¶ 1.  He was sentenced to eight years in prison.  *Id*.  The parties agree that if Barker were to return to France to face these charges, he would be permitted a new trial and a bail application.  Tr. II at 12-13.

According to the record, which the Government does not dispute, in 2003, Barker moved to New York.  Tr. II at 16-17.  While in New York, Defendant has been consistently and productively employed and has no criminal record in the United States.  Tr. II at 17, 35.  Significantly, although the Government represented that in 1999, French authorities issued some type of unidentified notices "for all international flights" to locate Barker, these did not include an Interpol Red Notice, Tr. II at 3-4, 29, and the Government concedes that Barker has been living openly in New York for so long under his own name.  In fact, the Defendant he has become a naturalized citizen and traveled internationally, including four trips to Guyana under his own name as late as 2019.  Tr. II at 5, 31.  While here, Barker has raised three of his four children to adulthood, the fourth being six years old.  Tr. I at 6; Tr. II at 31-32. Moreover, although no one could explain how the French Government eventually learned that the Defendant has been living in New York for decades, Tr. II at 5, 18, the first request for extradition was not made until November 13, 2017, *see* Compl. Ex. A No. 00003-04, and it took multiple follow-up requests from French authorities

4

on February 5 and 23, 2021, April 14, 2022 and May 26, 2022 before Barker was arrested. *See id.* 00004-14; Tr. II at 7-9. In short, in the absence of any other submissions from the French or United States Governments, 17 years elapsed before a request for extradition was made, with the only explanation for the delay being that in 1999 Barker falsely represented to authorities who he was, and another five years passed once the French government requested his arrest for the Defendant to be apprehended. *See* DEs [13], [16], [17]. The Court's decision to grant bail is based on the analysis below.

## II. ANALYSIS

Extradition of fugitives is governed by 18 U.S.C. § 3184 where a treaty between the requesting country and United States is in force. The Republic of France and the United States maintain such a treaty that provides for extradition of individuals convicted of drug-related crimes of the type at issue here. *See* Extradition Treaty between the United States of America and France, U.S.-Fr., Apr. 23, 1996, S. Treaty Doc. No. 105-13 (1997), and the Instrument as contemplated by Art. 3 ¶ 2, of the Agreement on Extradition the United States of America and the European Union signed 25 June 2003, as to the application of the Extradition Treaty between the United States of America and France signed 23 April 1996, U.S.-Fr., Sep. 30, 2004, S. Treaty Doc. No. 109-14 (2006) (Compl. Ex. A 00015-51); *see also Germany v. United States*, 06 CIV 1201 (DLI), 2007 WL 2581894, at *3-6 (E.D.N.Y. Sep. 5, 2007) (recognizing applicability of the treaty terms in the extradition context involving an

5

*in absentia* drug conviction); *In re Extradition of Dumitru*, 21-mj-2673, 2022 WL 18403006, at *3 (S.D. Tex. Jun. 21, 2022) (same).

Unlike in the domestic context, where bail is generally presumed under the Bail Reform Act, *see* 18 U.S.C. § 3142(b), there is presumption against bail in extradition proceedings. *In re Extradition of Heras*, 22-MJ-271 (TAM), 2022 WL 3909174, at *2 (E.D.N.Y. Aug. 31, 2022); *United States v. Messina*, 566 F. Supp. 740, 742 (E.D.N.Y. 1983). Indeed, the Supreme Court has expressly provided for bail only in "special circumstances." *Wright v. Henkel*, 190 U.S. 40, 63, 23 S. Ct. 781, 787 (1903); *United States v. Leitner*, 784 F.2d 159, 160 (2d Cir. 1986); *In re Extradition of Nagy*, 17mj3283, 2017 WL 6558487, at *4 (N.D. Ohio Dec. 21, 2017) (recognizing that the "special circumstances" test has been applied for over a hundred years). The basis for the presumption is to assure that the United States can better honor its treaty obligations and avoid the "serious embarrassment" that would result from the United States being unable to produce a bailed defendant who absconded. *Wright*, 190 U.S. at 62, 23 S. Ct. at 786; *see Leitner*, 784 F.2d at 160; *Heras*, 2022 WL 3909174, at *2; *In re Extradition of Sacirbegovic*, 280 F. Supp. 2d 81, 83 (S.D.N.Y. 2003). Accordingly, "bail is the exception, not the rule." *In re Extradition of Menard*, 21-MJ-39 (RER), 2021 WL 1264260, at *2 (E.D.N.Y. Apr. 5, 2021); *see In re Mitchell*, 171 F. 289, 289 (S.D.N.Y. 1909) (Hand, J.) (bail in the extradition context should be granted "only in the most pressing circumstances, and when the requirements of justice are absolutely peremptory . . . ."); *see also Lo Duca v. United States*, 95-CV-713 (DGT), 1995 WL 428636, at *15 (E.D.N.Y. Jul. 7, 2005) (quoting *United States v. Henkel*, 46 F.2d 84

(S.D.N.Y. 1912) (referring bail in extradition proceedings as "'an unusual and extraordinary thing'" to be granted "sparingly")). The special circumstances test involves a "fact-specific inquiry." *Matter of Extradition of Bell*, 21-mc-80533-UNA, 2021 WL 1616127, at *4 (S.D. Fla. Apr. 26, 2021).

The analysis requires consideration of risk of flight, danger to the community and the existence of the *Wright* "special circumstances." *Heras*, 2022 WL 3909174, at *2-3; *In re Extradition of Mitchell*, 22-MC-29, 2022 WL 4298142, at *14 (N.D. W. Va. Sep. 1, 2022); *see Salerno v. United States*, 878 F.2d 317, 317 (9th Cir. 1989); *In re Extradition of Beresford-Redman*, 753 F. Supp. 2d 1078, 1087-88 (C.D. Cal. 2010). The burden is on the Defendant to meet the applicable standard for risk of flight and danger to the community by clear and convincing evidence. *Heras*, 2022 WL 3909174, at *3; *Menard*, 2021 WL 1264260, at *2 (citing *Salerno*, 878 F.2d at 317). The decision to determine bail rests with the discretion of that trial court. *Menard*, 2021 WL 1264260, at *3; Tr. II at 10 (Government agrees decision is in the trial court's discretion).

### A. Risk of Flight

The first factor the Court considers is risk of flight, and concludes that it is minimal. It is undisputed that since moving the United States in 2003 Barker has developed substantial ties to the community, having been married and raised three children to adulthood, and still raising the fourth. He is married and living with his wife and has been gainfully employed throughout this period, the last six years for the City of New York where he still works. These relationships were clearly

7

supported at oral argument where numerous family members appeared in support and signed the required bond without hesitation. In addition, Defendant willingly offered to forfeit travel documents and passports, remain outside a prescribed radius of all airports and be electronically monitored. The Court concludes in light of these facts that he does not present a flight risk. *Accord Matter of Extradition of McGrath*, 21 MJ 5058 (PED), 2021 WL 5983127, at *5 (S.D.N.Y. Dec. 15, 2021) (granting bail subject to certain conditions).

In reaching this conclusion the Court acknowledges the Government's position that Defendant lied to law enforcement in 1999 about his identity in order to abscond, and this is a legitimate concern. Nevertheless, there is no evidence of Barker using an alias for any purpose since 1999, and he has been living openly under his own name for decades, so much so that he became a naturalized citizen. Accordingly, the Court rejects this fact as a basis to deny bail.

### B. Danger to the Community

The issue of danger to the community is easily disposed of. The crimes at issue were non-violent and Barker has no criminal record since arriving in the United States. There is no basis to conclude that he is a danger to the community.

### C. Special Circumstances

The central issue is whether the Defendant has demonstrated the necessary special circumstances sufficient to warrant bail. Although there is no exhaustive list of what rises to the level of special circumstances, the courts in this district and elsewhere have summarized a list of examples where a defendant has:

8

1. Raised substantial claims which have a high probability of success on the merits;

2. Suffered a serious deterioration of health;

3. Shown that there is an unusual delay in the appeals process;

4. Shown that the extradition proceeding will be unusually long and complex;

5. Shown that the requesting country would grant bail in a comparable extradition case; and

6. Shown by clear and convincing evidence that bail is available for the substantive offense in the requesting country.

*Heras*, 2022 WL 3909174, at \*2; *Menard*, 2021 WL 1264260, at \*3; *In re Extradition of Kapoor*, 11-MJ-456 (RML), 2011 WL 2296535, at \*2-3 (E.D.N.Y. Jun. 7, 2011); *Lo Duca*, 1995 WL 428636, at \*15 (citing *In re Extradition of Nacif-Borge*, 829 F. Supp. 1210, 1216-19 (D. Nev. 1993)); *see also United States v. Castaneda*, 739 F. Supp. 2d 49, 56 (D. Mass. 2010) (recognizing some of these examples and others). Other examples include there was no suitable facility for a juvenile defendant, *see Hu v. Yau-Leung v. Soscia*, 649 F.2d 914, 920 (2d Cir. 1981), where a defendant might lose "all his fortune" if not permitted to complete participation in a civil proceeding under way at the time of his arrest, *see Mitchell*, 171 F. at 289-90, and where the defendant takes care of a severely disabled ill spouse. *See In re Extradition of Tautvydas*, 22 CR 615, 2023 WL 1069853, at \*6 (N.D. Ill. Jan. 27, 2023) (spouse with advanced Alzheimer's Disease); *Matter of Extradition of Netzky*, 20-mj-220, 2022 WL 2315976, at \*1 (D. Or. Jun. 28, 2022) (disabled spouse among other factors); *see generally* Karl

9

Oakes, *Allowance of Bail in International Extradition Proceedings*, 60 A.L.R. Fed. 2d 203 (2011) (compiling cases).

Most relevant to Barker's application here is the delay between his conviction *in absentia* in 1999 and his arrest in 2023. In this regard, the issue is whether the delay reflects a lack of priority in the requesting country's prosecution. *Heras*, 2022 WL 3909174, at *5; *Kapoor*, 2011 WL 2296535, at *3; *United States v. Bowman*, 19-MJ-5089-JLB, 2020 WL 835342, at *6-7 (S.D. Cal. Feb. 2, 2020) (granting bail where there was a three and one-half year delay in the investigation that was unexplained); *In re Extradition of Chapman*, 459 F. Supp. 2d 1024, 1027 (D. Haw. 2006). The logic is that a lack of priority demonstrates a lack of diplomatic necessity to detain the defendant—the animating reason for a presumption in favor detention in the first place as recognized by the Supreme Court 120 years ago in *Wright*. *See Heras*, 2022 WL 3909174, at *5 ("Courts have found that if a requesting country has delayed seeking the extradition of a person in the United States, it may show that a particular individual's prosecution is not a priority to that country, undercutting the diplomatic necessity for detention."). This lack of priority is "typically" demonstrated by showing undue delay after commencing an investigation or issuing a fugitive's arrest warrant. *Id.*

Applying these standards, the Court concludes that Barker has established the necessary "special circumstances" to warrant his release. At the outset, the Court acknowledges that the crime at issue is non-violent and that the Defendant would be entitled to a new trial in France if he wishes, along with the opportunity to seek bail

in the interim. These facts do not weight in the Court's decision, however. Barker was determined to be one of the heads of an international cocaine importation operation—a serious crime. With respect to the availability of bail in France, and it appearing unfair to detain a defendant in New York while awaiting extradition, only to be potentially bailed in France, bail in each jurisdiction serves a different purpose in this case. Although not addressed during oral argument, presumably France has its own standards for bail, whether they include risk of flight, danger to the community or other concerns. Here however, detention serves the purpose of permitting the U.S. to more readily live up to its treaty obligations by assuring the presence of the defendant at criminal proceedings in the requesting country, rather than suffer the potential embarrassment of having the defendant and then having to confess to losing him. In addition, the Court is of the opinion that the question of whether bail is granted in France, especially where there is evidence that this Defendant has already eluded law enforcement once by the use of a fictitious name—albeit nearly 25 years ago—may lead to denial of bail where it might otherwise have been granted. Accordingly, the availability of bail in France is too speculative to credit.

The single reason why bail is being granted in this instance is the unexplained delay by both the French and United States Governments in tracking this Defendant down. Indeed, the only action offered is that France issued several unidentified notices in 1999 that should have prohibited Barker from international travel, yet he has been to Guyana no less than four times, the latest in 2019, without incident.

11

Then, when France alerted the U.S. in 2017 of Barker's presence here—there having been so much delay that he became a naturalized citizen in the interim and raised three of his four children to adulthood—it still took four more letters from the French Government over five years for Barker to be arrested. And at this time, nearly 25 years after the original crime, Barker was not home when law enforcement arrived. His wife called him, and he came home to meet them rather than abscond. These facts are sufficient to constitute the "special circumstances" warranting release. Accordingly, Barker's motion for bail is granted, and he is released subject to the conditions addressed on the record and in the prior order of the Court issued immediately after oral argument. Tr. II at 58-62; DE [15] (prior order).

### III. CONCLUSION

For the reasons set forth above, Defendant's motion for bail is granted subject to the conditions imposed in prior proceedings.

Dated:    Central Islip, New York
          February 13, 2023          **SO ORDERED:**


                                     /s/ Steven I. Locke
                                     STEVEN I. LOCKE, USMJ