UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X

IN RE THE EXTRADITION OF
GEORGES BARKER,                                         23-MJ-27 (SIL)

---------------------------------------------------------------X   **MEMORANDUM OF DECISION AND ORDER**

**STEVEN I. LOCKE, United States Magistrate Judge:**

Presently before the Court is the Government's motion seeking the certification of Georges Barker ("Relator" or "Barker") for extradition to France. Barker opposes. The Court held a hearing on November 15, 2023 followed by post-hearing briefing. *See* DE [45, 48, 49] (transcript of proceedings, DE [45-1], "Tr.") For the reasons set forth below, Barker is certified for extradition.

**I.   Background**

The facts underlying these proceedings are submitted by the Office of the United States Attorney, based on information provided by the French government and are as follows.

*A.  The narcotics investigation*

French law enforcement began an investigation into a drug importation operation purportedly managed by Barker with the arrest of Frédéric Touloupe ("Frédéric") and Avril Dey ("Dey") on January 22, 1998, when the two arrived at Orly International Airport in Paris, France from Cayenne, French Guiana with 4.716 kilograms of cocaine in Frédéric's possession. *See* DE [45-4] at HRG-00236. According to Frédéric, his sister Nelly Touloupe ("Nelly") had introduced him to a

couple, Georgy, who had supplied the drugs the prior evening, and a woman who provided plane tickets and money. *Id*. at HRG-000236. Their destination in Paris was the Hotel Terminus-Nord. *Id*. The plan was that another woman transporting on the same flight would reach out and take him to the hotel. Frédéric was to receive $6000 for the trip. *Id*. Frédéric knew Dey only "by sight" and noticed her in the Cayenne airport. *Id*. Nelly had also told Frédéric that Dey did "runs." *Id*.

Dey told a similar story, in that a couple she knew as "Georges and Wamba" asked her to accompany a woman from Cayenne to Paris for $2000. *Id*. That woman, whose name is not provided, would point out a man for her (Dey) to tap on the shoulder. *Id*. Dey kept a phone number in her mobile phone for "Georges" under an entry for "Cayenne-Georgy." *Id*.

That same day, French law enforcement learned that a room was booked at the Hotel Terminus-Nord under the name "Deie" by two women who called several times from Guyana. *Id*.

Two days later, January 24, 1998, French authorities questioned another individual, Willie Lewis West ("West"), who had traveled to Paris from Cayenne carrying 4.7 kilograms of cocaine. DE [45-3] at HRG-000052; DE [45-4] at HRG-000236-37. West admitted that he had made multiple trips over the prior two years, earning $10,000 per trip. DE [45-4] at HRG-000236-37. When he arrived, he, like Frédéric and Dey, would meet a contact at the Hotel Terminus-Nord, who would pick up the "goods." *Id*. And like Dey, he had a phone number for "Georges" in his phone, who had been called several times from the hotel. *Id*.

2

On February 16, 1998, authorities arrested and questioned Nathalie Deie ("Deie"), who had arrived from Cayenne with 2.550 kilograms of cocaine. *Id.* at HRG-000237. According to Deie, she had met someone named Romi Ogula ("Romi") in Cayenne who proposed that she carry "something" to Paris in exchange for money. *Id.* This trip was not the first Deie had done for Romi. *Id.* Upon arriving in Paris, she went to the Hotel Terminus-Nord, where a woman from Cayenne was waiting and the cocaine would be passed on. *Id.*

From here the investigation extended to French Guiana, where, on March 9, 1998, law enforcement went to the home of Yvelaw Christian ("Christian"), whose telephone number Deie had called from the Hotel Terminus-Nord. *Id.* at HRG-000238. Christian was not home at that time. *Id.* A man who identified himself as Jordan Hashley ("Hashley") was present however. *Id.* Hashley explained that he was a fisherman and that he and Christian were friends. *Id.* The investigators then released Hashley. *Id.*

Christian subsequently turned himself in and stated that Hashley was living with him, that he knew Barker as "Georgie" and Barker's spouse Wamba Presno, although he claimed that he did not know their address. Christian at some point later confessed that he had lied, and that Hashley was Barker, "a cocaine dealer who used several identities." *Id.* Moreover, he and Barker were sufficiently close that Barker attended his wedding and Christian was a godfather to one of Barker's children, and that Barker had told him (Christian) that he and Presno recruited couriers to carry illegal drugs from Suriname to Europe including Frédéric, Nelly and

3

Deie. *Id*. With respect to the current investigation Christian explained that Nelly had been recruited by Barker's brother Montgomery Kelvin Barker ("Montgomery") and that she and Deie had been to Suriname to pick up cocaine. *Id*. Christian further stated that he and Barker knew of the January 22, 1998 arrests, with Barker having been informed by Kay Butcher, another person they knew. *Id*.

Nelly was then arrested in Cayenne, and stated that her boyfriend Montgomery, who used an alias – Mark Boise – introduced her to the trafficking operation, which was led by Barker and Presno, who pressured her to convince Frédéric, her brother, to carry drugs to Paris. *Id*. at HRG-000238-39. According to Nelly, Christian's home was the "headquarters" of the drug operation, and others involved included, Dey, Deie, Presno's sister, Trevor Barker—another of Barker's brothers, and Trevor's wife Marie-Elmira Germain ("Germain"). *Id*. Various of these facts were corroborated. For example, Germain stated that Dey was involved in drug trafficking and that Montgomery had used the alias, Mark Boice, which he had given to investigators. *Id*. at HRG-000239-41. Finally, Dey, Frédéric, Nelly and Germain all identified Barker from a photograph. DE [45-3] at HRG-000098, 139-40 (photograph).

Based on the investigation, law enforcement concluded that Barker and Presno were leading an illegal drug trafficking operation sending cocaine from South America to Europe, *id*. at HRG-000053, recruiting and paying cash to people who ran the drugs from Suriname or Guyana to Paris. *Id*.

4

*B. The French criminal proceedings*

On April 2, 1999 the investigating judge in France issued a warrant for Barker's arrest. DE [45-4] at HRG-000241, 245. Barker was tried *in absentia* and on October 29, 1999, Barker was convicted in the Criminal Court in Creteil, France on drug related charges: (1) illegal importation of narcotics (cocaine) contrary to Articles 222-36 ¶ 1 and 222-41 of the French Penal Code; Articles L627, R5171-72 and 5179-81 of the Code of Public Health; and Article 1 of Ministerial Decree 90-A498 2/22/1990; (2) illegal transport of narcotics (cocaine), contrary to Articles 222-37 ¶ 1 and 222-41 of the French Penal Code; Articles L627, R5171-72 and 5179-81 of the French Code of Public Health; and Article 1 of Ministerial Decree 90-A498 2/22/1990; (3) illegal possession of narcotics (cocaine) contrary to Articles 222-37 ¶ 1 and 222-41 of the French Penal Code; Articles L627, R5171-72 and 5179-81 of the French Code of Public Health; and Article 1 of the Ministerial Decree 90-A498 2/22/1990; (4) illegal offer or sale of narcotics (cocaine), contrary to Articles 222-37 ¶ 1 and 222-31 of the French Penal Code; Article L627, R5171-72 and 5179-81 of the French Code of Public Health; and Article 1 of Ministerial Decree 90-A498 2/22/1990; and (5) importation of totally prohibited goods (cocaine), contrary to Articles 414 ¶ 1, 417 ¶ 1, 418, 420-22 and 38 of the French Customs Code. *See id*. at HRG-000235, 260-61. Eleven defendants were tried, with only five (not including Barker) attending the proceedings. *Id*. at HRG-000261. Nevertheless, Barker was convicted and sentenced to eight years in prison. *Id*. at HRG-000241, 261, 270, 279, 285. The parties agree that if Barker were to return to France to face these charges, he would be permitted

5

a new trial and a bail application. *See* Tr. at 6-7; DE [45-2] at HRG-000241; *but see* Tr. at 43-44 (noting that the new trial may be more limited in the sense that Barker could provide evidence but transcripts from earlier French proceedings may be relied upon).

   C. *Post-conviction events*

According to the record, which the Government does not dispute, in 2003, Barker moved to New York, and became a naturalized citizen in 2011. DE [31-1]. While in New York, he lived openly under his own name. *Id.* As a New York resident, the Relator has been consistently and productively employed, including as a plumber for the New York City Transit Authority and as a foreman for an entity known as Bay Ridge Mechanical. *Id.* He has filed tax returns in his own name, raised three of four children to adulthood and has travelled internationally under his own name, including four trips to Guyana, most recently in 2023. *Id.* Moreover, Barker has no criminal record in the United States. *Id.*

Curiously, nothing happened with respect to the French conviction for 13 years, until 2012, at which time France sought an INTERPOL red notice. DE [45-4] at HRG-0000285-86. There is no explanation for the delay—despite an inquiry to the requesting court. DE [32-3], DE [45-4] at HRG-000285-86. The French government also could not explain why Barker had not been picked up coincident with his prior international travel. DE [45-4] at HRG-000285-86.

On September 20, 2017, Barker was arrested in connection with a traffic accident by the New York City Police Department, *id.* at HRG-000234, at which time

6

he gave his true name and date of birth. At this point, the officers on the scene became aware of the INTERPOL notice. NYPD Lieutenant Carlos Fabara got in contact with the INTERPOL office in Washington D.C. which contacted the INTERPOL office in France, stating that if France requested extradition Barker could be picked up in the next 72 hours and likely less. DE [48-1].

Three weeks later, by letter dated October 6, 2017 Barker's arrest was requested. DE [45-4] at HRG-000234-42. Diplomatic Notes requesting extradition dated November 13, 2017, February 5, 2021, February 23, 2021, April 14, 2022 and May 26, 2022 were sent. *See* DE [45-2] at HRG-000001, 4-14. Nevertheless, Barker was not arrested for another 5 ½ years, on February 22, 2023, again with no explanation for the delay. Further, France acknowledged the conviction for smuggling cocaine was time-barred. DE [45-4] at HRG-000279-80.

The extradition hearing was held in this Court on November 15, 2023 and post-hearing briefing concluded on February 27, 2024.

## II. Discussion

"Extradition is the process by which a person charged with or convicted of a crime under the law of one state is arrested in another state and returned for trial or punishment." *Austin v. Healy*, 5 F.3d 598, 600 (2d Cir. 1993). The role of court is limited—to determine whether to certify to the Secretary of State whether the evidence submitted is sufficient. 18 U.S.C. § 3184. The ultimate question is not whether the Relator is guilty or innocent, but rather whether there is probable cause to support the charge. *Neely v. Henkel*, 180 U.S. 109, 123, 21 S. Ct. 302, 307 (1901);

7

*Austin*, 5 F.3d at 600; *In re Extradition of Heras*, No. 22-MJ-271 (TAM), 2023 WL 4207893 at * 3 (E.D.N.Y. June 27, 2023).

An extradition hearing is neither a criminal nor a civil proceeding. *In re Extradition of Ernst*, 97 Crim. Misc. 1, 1998 WL 167324 at *1 n.4 (S.D.N.Y. Apr. 9, 1998). Rather the process is *sui generis*. *Jhirad v. Ferrandina*, 536 F.2d 478, 482 (2d Cir. 1976). The ultimate decision as to extradition rests not with the Court—it is for the Secretary of State to decide. *See* 18 U.S.C. § 3186; *Lo Duca v. United States*, 93 F.3d 1100, 1103-04 (2d Cir. 1996).

Where, as here, the parties do not contest that this Court has the authority to preside over this extradition proceedings, *see* 18 U.S.C. § 3184 (authorizing magistrate judges to conduct extradition proceedings; Local Crim. R. 59.1(b) (same); *Austin*, 5 F.3d at 602-03 (same), that the Court has jurisdiction over the relator— here Barker was living in and apprehended in this judicial district, *see* 18 U.S.C. § 3184; *In re Orellana*, No. 00 Cr. Misc. 1, 2001 WL 266073, at *3 (S.D.N.Y. Mar. 15, 2001), or that there is a valid treaty in force, *see* DE [48] at 11 ("[a] valid treaty is in place"); 18 U.S.C. § 3184; *see Skaftouros v. United States*, 667 F.3d 144, 154-55 (2d Cir. 2011) (outlining elements), the Court must consider whether: (a) the treaty covers the crimes for which extradition is requested; and (b) there is sufficient evidence to support a finding of probable cause as to each offense for which extradition is sought. *See Skaftouros*, 667 F.3d at 154-55 (quoting *Cheung v. United States*, 213 F.3d 82, 88 (2d Cir. 2000)); *In re Ogorek*, No. 20-MJ-1988-SJB, 2021 WL 1202244, at *1 (E.D.N.Y. Mar. 31, 2021).

8

### A. *Whether the treaty covers the crimes at issue*

The United States and France maintain an extradition treaty. *See* Extradition Treaty Between the United States of America and France with Agreed Minute, U.S.-Fr., Apr. 23, 1996, S. Treaty Doc. No. 105-13 (1997) (the "1996 Treaty") and the Instrument contemplated by Art. 3, para. 2 of the Agreement on Extradition between the United States of America and the European Union signed 25 June 2003 as to the application of the Extradition Treaty between the United States of America and France signed 23 April 1996, U.S.-Fr., Sept. 30, 2004, S. Treaty Doc. 109-14 (2006) (the "Instrument," together with the 1996 Treaty, the "Treaty").

The Treaty provides for extradition of individuals "whom the competent authorities in the Requesting State have charged with or found guilty of an extraditable offense." Treaty Art. 1. Conduct shall be extraditable if it is punishable under both states' laws "by deprivation of liberty for a maximum of at least one year or by a more severe penalty." Treaty Art. 2(1). An offense will be extraditable regardless of whether the two states categorize the criminal conduct similarly. Treaty Art. 2(3).

In comparing both states' laws, the Court should determine whether the criminal conduct under French law would also be criminal under U.S. law. *Hu Yau-Leung v. Soscia*, 649 F.2d 914, 918 n.4 (2d Cir. 1981). The crimes need not be identical however. Rather, they must be "directed to the same basic evil." *Shapiro v. Ferradina*, 478 F.2d 894, 908 (2d Cir. 1973). This comparison is sometimes referred to as "dual criminality." *Lo Duca*, 93 F.3d at 1111-12.

9

Applying these standards, the dual criminality test is satisfied. France seeks Barker's extradition for illegal importation of cocaine, illegal transport of cocaine, illegal possession of cocaine, and illegal offer or sale of cocaine. Such conduct, if committed in the United States would violate various criminal drug statutes, including 21 U.S.C. §§ 841(a)(1), 844(a), 846 and 952(a) (together addressing crimes involving possessing and sale of controlled substances including cocaine) as well as 960(b)(2) and 963 (concerning conspiracy), and which provide for significant periods of incarceration.[1]

The Treaty does contain other limitations, however. Relevant here, the Treaty provides, "Extradition shall be denied if the prosecution of the offense or execution of the penalty has been barred by the lapse of time under the laws of the Requested State [here the US]." Treaty Art. 9(1). Further, "Acts in the Requesting State that would interrupt or suspend the prescriptive period are to be taken into account by the Requested State to the extent possible under its laws." *Id.* at 9(2).

Before interpreting Article 9 of the Treaty several general points of law must be recognized. A relator in an extradition proceeding does not have the same overarching due process rights that he may have in a local criminal proceeding. *See Neely*, 180 U.S. at 122, 21 S. Ct. at 307 (U.S. Constitutional rights do not apply to criminal prosecutions abroad such that they may bar extradition); *Kamrin v. United States*, 725 F.2d 1225, 1228 (9th Cir. 1984)("United States due process rights cannot be extended extraterritorially"); *see also Murphy v. United States*, 199 F.3d 599, 602

---

[1] Initially Barker challenged his extradition based on a failure of dual criminality. *See* DE [26] at 2. He later abandoned this argument. *See* DE [48].

10

(2d Cir. 1999) (rejecting general due process claim and recognizing that "delay may not . . . serve as a defense to judicial extradition proceedings") (quoting *Kamrin,* 725 F.2d at 1227); *Kollmar v. United States*, 642 F. Supp. 3d 982, 993 (N.D. Cal. 2022) (same). Similarly, a relator has no Sixth Amendment right to a speedy trial in extradition proceedings. *Jhirad*, 536 F.2d at 485 n.9 ("the Sixth Amendment's guarantee to a speedy trial, limited by its terms to criminal prosecutions, is inapplicable to international extradition proceedings"). In short, there is no overarching right to a "speedy extradition." *Strachan v. Colon*, 941 F.2d 128, 132 (2d Cir. 1991) ("[n]othing in the Constitution or in the applicable federal statute indicates that a fugitive has a right to a 'speedy extradition' or that there exists a statute of limitations for extradition"); *see In re Drayer*, 190 F.3d 410, 415 (6th Cir. 1999) (delay alone does not give rise to a due process defense in the extradition context); *In re Extradition of Harrison*, No. 03 CR. MISC. 01, 2004 WL 1145831 at *8 (S.D.N.Y. May 21, 2004); *see also In re Extradition of Bowman*, No. 19MJ5089-JLB, 2020 WL 6689807 at *12-13 (S.D. Cal. Nov. 13, 2020) (there are no Fifth or Sixth Amendment rights generally applicable to extradition proceedings, which are not criminal in nature).

Accordingly, to the extent that the delay in seeking Barker's extradition may serve as a defense, it must be found in the language of the Treaty. *See* DE [48] at 7 (arguing that the Treaty "incorporates U.S. timelines protections to bar the delayed prosecution of an offense or execution of a penalty"). Instructive on this issue is the Sixth Circuit's *en banc* opinion in *Martinez v. United States*, 828 F.3d 451 (6th Cir

11

2016).[2] There the Court was confronted with similar treaty language governing extradition between the United States and Mexico. Article 7 of the U.S.-Mexico treaty provided that "'Extradition shall not be granted, . . . when the prosecution or the enforcement of the penalty . . . has become barred by the lapse of time according to the laws of the requesting or requested Party.'" *Martinez*, 828 F.3d at 455-56 (quoting Extradition Treaty, U.S.-Mex. Art. 7, May 4, 1978, 31 U.S.T. 5059, 5064-65). The question there, as here, is whether the reference to a "lapse of time" under the laws of the requesting and requested states refers to statutes of limitations, or something broader, such a violation of Sixth Amendment speedy trial rights resulting from the unusual delay in seeking extradition.

In answering the question, the court relied on a number of considerations, all weighing in favor of a narrower reading for several reasons. Initially, the "lapse of time" means that "time must do the barring." *Id*. at 457. The Sixth Amendment, while considering delay however, is an "amorphous" "slippery" standard that does not establish a time limit. *Id*. at 457 (citing *Baker v. Wingo*, 407 U.S. 514, 521-22, 92 S. Ct. 2182, 2188 (1972) (internal quotations omitted). Rather, it requires consideration of four factors: length of delay, reason for the delay, the defendant's assertion of the right and prejudice. *Id*. at 458. Accordingly, lapse of time alone does not violate the constitutional right to a speedy trial.

---

[2] The Court notes that the Second Circuit has cited *Martinez* with approval on different points not at issue here. *See Yoo v. United States*, 43 F.4th 64, 72, 80 (2d Cir. 2022) (addressing treaties that "permit" as opposed to "forbid" denial of extradition, and that different countries may have different priorities when negotiating treaties).

12

This interpretation is consistent with a reading of the French and English versions of the Treaty when considered in combination. *See id.* at 459 (quoting *United States v. Percheman*, 32 U.S. (7 Pet.) 51, 88, 8 L.Ed. 604, 629 (1833) (if the two forms can be read together "without violence" and "made to agree," "that construction which established conformity ought to prevail"). Here, the French version of the Treaty provides, "1. L'extradition est refusée si l'action publique ou la peine sont prescrites selon la législation de l'Etat requis. 2. Les actes effectués dans l'Etat requérant qui ont pour effet d'interrompre ou de suspendre la prescription sont pris en compte par l'Etat requis, dans la mesure où sa législation le permet." Traite D'Extradition Entre La France Et Les Etats-Unis D'Amerique, Art. 9 (1996), https://www.legifrance.gouv.fr/jorf/jo. The term "prescription" in French translates to "statute of limitations" or "limitation period", *see* Elsevier's Legal Dictionary in English, German, French, Dutch and Spanish 915 (1st ed. 2001), which further establishes that a more limited reading of the term "lapse of time" is appropriate.

Moreover, "lapse of time" must be read within the larger context of the Treaty, and the history of treaty interpretation as a whole, which treat the terms "lapse of time" and "statute of limitations" synonymously. *Martinez*, 828 F.3d at 458-61. Here, the subsequent paragraph refers to a "prescriptive period," which logically refers to a statute of limitations period rather than the multi-factored Sixth Amendment right. *See id.* at 461 (citing the Treaty at issue in this case, *i.e.*, the U.S.-France Treaty, as treating the terms as synonyms).

13

Indeed, those courts to consider this issue have come to a similar conclusion, as has scholarly commentary. *See id.* at 462-63 (collecting cases and referring to the Third Restatement of Foreign Relations Law § 476); *Yapp. v. Reno*, 26 F.3d 1562, 1568 (11th Cir. 1994).

Finally, the Sixth Circuit concluded that to the extent there is any ambiguity in the term "lapse of time," it must be resolved in favor of the rights of the parties to the treaty. *Martinez,* 828 F.3d at 463 (citing *Factor v. Laubenheimer,* 290 U.S. 276, 293-94, 54 S. Ct. 191, 195-96 (1933)).

All of these factors weigh in favor of the more limited interpretation of "lapse of time" to refer to a statute of limitations. This does not end the inquiry however. Here, Barker does not argue only that the Treaty's terms require incorporation of the Sixth Amendment speedy trial requirement. Rather, he also takes the position that the term incorporates his Fifth Amendment due process rights. DE [48] at 5-9.[3] In the end however, this is a distinction without a difference. All of the same considerations above militate in favor a more narrow reading, regardless of which constitutional right is considered. *See Yapp*, 26 F.3d at 1566-67 (treating the Fifth and Sixth Amendment arguments together). Accordingly, the Court concludes that the Treaty's "lapse of time" language refers to the signatory countries' statutes of limitations and does not incorporate broader constitutional rights. As a result, the

---

[3] Barker does not argue that a separate statute of limitations violation exists. DE [48] at 15.

14

lapse of time that occurred here, while considerable, cannot be used as a defense to extradition as Barker argues.[4]

### B. *Whether there is probable cause for extradition*

There is also probable cause to extradite Barker. The evidence France submits, which the Court must accept as true for the purposes of these proceedings, *In re Extradition of Cheung*, 968 F. Supp. 791, 794 n.6 (D. Conn. 1997); *In Extradition of Atta*, 706 F. Supp. 1032, 1050-51 (E.D.N.Y. 1989), is sufficient to warrant extradition. As outlined above, the evidence suggests that Barker and his wife led a criminal operation whereby he recruited couriers to import cocaine from French Guiana and Suriname to France. DE [45-2] at HRG-000053. Barker was identified from photographs, and the others involved in the operation told a consistent detailed story, often contrary to their own interests. *See* DE [45-3, 45-4] at HRG-000052, 236-37 (explaining the operation, including how they were contacted at Orly Airport, used the Hotel Terminus Nord in Paris as a meeting place, and had Barker's contact information which they used).

In reaching this conclusion the Court rejects the Relator's attempts to attack the sufficiency of this evidence. DE [48] at 21-27. While his arguments may be appropriate in other contexts, such before the Secretary of State,[5] or if and when

---

[4] Because the Court holds that the Relator's argument that his due process rights are incorporated into the Treaty's terms fails, it does not reach the issue of whether any such due process rights were violated. *See* DE [48] at 9. Further, Court does not reach any conclusion about whether the due process clause may apply to extradition proceedings in other contexts, and does not, in any event, interpret the Government's arguments so broadly. *See id.* at 6.

[5] Nothing in this opinion should be read to preclude Barker from arguing to the Secretary of State that the decades-long delay in making his arrest in the United States, where he lived openly for so long without incident, became a U.S. citizen and raised three children to adulthood, has never been satisfactorily explained.

Barker returns to France and challenges his underlying conviction, they do not defeat a probable cause finding here. Moreover, the Court need not address the conflicting arguments about whether the probable cause standard in the extradition context differs from that applied to local warrants. *Compare* DE [48] at 21-23, *with* DE [49] at n 8, n.9. The Court finds that evidence supplied by the French government is sufficient. Accordingly, the Court concludes that the standards for extradition have been met, and the extradition is certified.

### III. Conclusion

For the foregoing reasons, the Government's application for Relator Georges Barker to be certified for extradition is granted.

Dated:     Central Islip, New York
           March 26, 2024                    SO ORDERED:


                                             /s Steven I. Locke
                                             STEVEN I. LOCKE, USMJ